**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-4661**

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

      v.

JAIR FRANCIS,

             Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.   Alexander Williams, Jr., District Judge.  (8:05-cr-00451-AW-4)

Argued:  March 26, 2009                    Decided:  May 18, 2009

Before MOTZ and AGEE, Circuit Judges, and Thomas D. SCHROEDER, United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Robert Charles Bonsib, MARCUS & BONSIB, Greenbelt, Maryland, for Appellant.  Chan Park, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.  **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Gina L. Simms, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jair Francis was convicted by a jury of one count of conspiring to violate the Mann Act, 18 U.S.C. § 371 ("Count One"), one count of conspiracy to harbor illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(v)(I) ("Count Two"), and one count of aggravated identity theft, 18 U.S.C. § 1028A(a)(1) ("Count Six"). He was sentenced to concurrent 20-month terms of imprisonment on Counts One and Two and a mandatory minimum, consecutive 24-month term of imprisonment on Count Six. He appeals the district court's admission of certain evidence during his trial and the reasonableness of his sentence. We affirm the judgment of the district court for the reasons set forth below.

I.

Elsy Yolanda Aparicio operated a brothel from an apartment in the Georgian Woods apartment complex ("Georgian Woods" or "the complex") in Wheaton, Maryland.[1] In 2003, Jair Francis, a leasing consultant at the complex, approached her with a

---

[1] This brothel was but one of several operated by the Aparicio family. Elsy was joined in this enterprise by her brother, Eliazor "Lito" Gonzales Aparicio; her sister, Dorinalda Marlene Aparicio; their aunt, Rosibel Aparicio Jandres; Rosibel's husband, Manuel Jandres; and Elsy's husband, Jonathan "Jorge" Lopez. We refer to these family members by their first names.

proposition: he informed her that the complex management knew she ran a brothel from the apartment and he offered to move her to a new apartment and notify her of any police inquiries at the rental office in exchange for $150 per week in addition to the monthly rent. Elsy accepted Francis' proposition and made the weekly payments. She also allowed Francis to avail himself of the prostitutes' services for free.

Some months later, Elsy encouraged Eliazor to contact Francis about opening a second brothel at Georgian Woods. Eliazor did so, and Francis demanded $2000 to arrange for a second apartment, initially located at 2209 Shorefield Road #711 ("Apartment 711"). Like Elsy, Eliazor paid Francis $150 per week in addition to the monthly rent and allowed Francis free access to the prostitutes.

In January 2004, unbeknownst to Francis and the Aparicios, police began investigating Eliazor's brothel based on information from a confidential informant. As the investigation progressed, Detective Leland Wiley met with Francis and the complex's assistant manager, Shannon Cooper, and asked them to watch for suspicious activity relating to Apartment 711. Francis notified Eliazor of Detective Wiley's investigation and arranged to move his brothel to a new apartment, located in the complex at 2217 Shorefield Road #513 ("Apartment 513").

Unfortunately for them, however, Wiley observed men moving furniture from Apartment 711 to Apartment 513.[2]

His curiosity piqued, Wiley asked Cooper why the tenant in Apartment 711 would move to another apartment in the same complex. Cooper consulted the complex's computer records and determined that the tenant, listed as Gayle Arrington, was being evicted from Apartment 711 for non-payment of rent. However, when Cooper checked the physical file for that apartment, it contained only Arrington's credit report; there was no executed lease agreement. There was no agreement because Arrington never leased Apartment 711.

Arrington had innocently contacted Georgian Woods in November 2003, while preparing to move from New Jersey to Maryland. She spoke with Francis and faxed him a rental application. Francis obtained Arrington's credit report and told her that the application was approved. Arrington ultimately changed her mind and never signed a lease or moved into the complex. Nevertheless, Arrington later found a claim by Georgian Woods for unpaid rent on her credit report.

In May 2005, unrelated to Wiley's investigation, New Jersey state police stopped a van registered to Manuel Jandres on the

---

[2] Police subsequently raided Apartment 513, whereupon Francis supplied Eliazor with yet a third apartment.

4

New Jersey Turnpike near Newark. The van contained thirteen female passengers and was one of two the Aparicio prostitution ring used to transport women from New York and New Jersey to Maryland to work in their brothels. The New Jersey state police brought in federal authorities, including a United States Immigration and Customs Enforcement ("ICE") agent who determined that at least two of the women were in the country illegally.

In September 2005, Georgian Woods was sold. In reviewing the complex's books in preparation for the sale, Cooper detected that Francis had mishandled rent receipts and altered computer records. Cooper presented her discoveries to David Brocklebank, the complex's manager. When confronted by Brocklebank, Francis produced a stash of checks and money orders he had secreted in his desk in violation of company policy. Brocklebank promptly fired him.

In June 2006, Francis was indicted along with other members of the Aparicio prostitution ring. Count One and Count Two of the indictment, principally based on the May 2005 traffic stop in New Jersey, alleged that Francis and others conspired to transport individuals in interstate commerce and harbor illegal aliens. Count Six alleged that Francis had stolen Arrington's identity to conceal the operation of a brothel from Apartment 711.

At trial, Brocklebank provided and testified about a rent roll produced from the complex's computer records. The rent roll showed information about every unit in the complex, indentifying the tenant and summarizing lease information. Brocklebank testified that the rent roll for January 2004 named Arrington as the tenant in Apartment 711, and additional documents showed arrearages in her account of $2,702.88. Francis objected to the introduction of and testimony about the rent roll. In addition, Brocklebank testified that he had fired Francis for the mishandling of rent payments. Francis also objected to the testimony about his termination. Finally, Francis' co-defendant objected to testimony concerning the immigration status of the female passengers in the van during the May 2005 traffic stop. All of these objections were overruled.[3]

Francis was convicted by a jury on all counts. The presentence report ("PSR") calculated his offense level as 19 with criminal history category I, resulting in a guidelines range of 30-37 months on Count One and Count Two plus 24 months as a mandatory minimum, consecutive sentence on Count Six--a

---

[3] Francis also filed Rule 29 motions for judgment of acquittal on Count One and Count Two asserting that the evidence was insufficient to prove his culpability. Francis does not appeal from the denial of those motions.

total of 54-61 months. Francis objected to the PSR, arguing that the Government had not proved that there were 5 or more victims for a sentence enhancement on Count One. Francis also argued that he qualified for a downward adjustment under § 3B1.2 of the Sentencing Guidelines and a downward departure under § 5K2.0.

The Government opposed the objections and the district court overruled them. Nevertheless, after considering the factors in 18 U.S.C. § 3553(a), the district court sentenced Francis to only 20 months' imprisonment on Count One and Count Two, to run concurrently, and to 24 months' imprisonment on Count Six, to run consecutively--a total of 44 months.

Francis filed a timely notice of appeal and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

Francis appeals from three of the district court's evidentiary rulings: the admission of the rent roll and Brocklebank's related testimony, the admission of Brocklebank's testimony about his termination, and the admission of testimony about the van passengers' immigration status. Francis also challenges his sentence, contending the evidence is insufficient to support the district court's finding of 5 or more victims on Count One, that the district court erred in denying a downward

7

adjustment under § 3B1.2 and a downward departure under § 5K2.0 of the Sentencing Guidelines, and that the sentence is unreasonable under <u>Gall v. United States</u>, 128 S. Ct. 586 (2007), and <u>United States v. Pauley</u>, 511 F.3d 468 (4th Cir. 2007).

## A.

We first consider Francis' evidentiary arguments. This Court "review[s] rulings concerning the admission of evidence for abuse of discretion." <u>United States v. White</u>, 405 F.3d 208, 212 (4th Cir. 2005).

## 1.

In his opening brief, Francis argued the rent roll was a summary exhibit offered under Federal Rule of Evidence 1006 but that he did not have access to source data from which it was compiled as required by that rule. <u>See</u> Fed. R. Evid. 1006 ("The originals, or duplicates, [of evidence from which summaries are created] shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place.") Francis abandoned this position at oral argument and conceded that the rent roll was a business record, but asserted that Brocklebank was not qualified to authenticate it.

Authenticated business records are excepted from the hearsay rule under Federal Rule of Evidence 803(6). The rule

requires that "the testimony of the custodian or other qualified witness" establish that the record was "kept in the course of a regularly conducted business activity, and [that] it was the regular practice of that business activity to make" the record. Fed. R. Evid. 803(6). Brocklebank testified that rent rolls were kept as part of the regular course of the complex's business and that he himself used them in the regular course of his duties. Accordingly, Brocklebank was a qualified witness to authenticate the rent roll and the district court did not abuse its discretion by admitting it as evidence.

2.

Francis argues that Brocklebank's testimony that he fired Francis for withholding tenants' rent and utilities payments contrary to company policy was improper bad act evidence admitted in violation of Federal Rule of Evidence 404(b) and that its prejudicial effect outweighed its probative value in violation of Rule 403. Francis submits that the testimony implied that he intended to embezzle the payments and did nothing to prove that he falsified computer records--i.e., adding Arrington to the rent roll--because each of the withheld payments had been recorded in the computer system. We disagree.

Bad acts evidence may be admitted either under the intrinsic act doctrine or Rule 404(b). The intrinsic act

9

doctrine allows evidence of bad acts to be admitted if the acts "arose out of the same series of transactions as the charged offense, or if [the evidence] is necessary to complete the story of the crime on trial." United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994) (internal quotation marks and alterations omitted). "Other criminal acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996) (internal quotation marks omitted).

Alternatively, bad acts not intrinsic to the charged offense may be admitted under Rule 404(b). United States v. Siegel, 536 F.3d 306, 315-16 (4th Cir. 2008) (citing Chin, 83 F.3d at 87-88); see also United States v. Tedder, 801 F.2d 1437, 1444 (4th Cir. 1986). In United States v. Queen, 132 F.3d 991 (4th Cir. 1997), we held that Rule 404(b) is a rule of inclusion that permits the admission of extrinsic bad act evidence "with only the one stated exception"--i.e., character evidence. 132 F.3d at 994-95. Therefore:

> evidence of prior[4] acts becomes admissible under Rules 404(b) and 403 if it meets the following criteria: (1)

---

[4] There is no distinction between "prior" bad acts and "subsequent" bad acts for the purposes of the rule, which speaks only of "other" bad acts. See Fed. R. Evid. 404(b); see also United States v. Hadaway, 681 F.2d 214, 217-18 (4th Cir. 1982) (Continued)

10

> The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. . . . (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

Id. at 997 (footnote added).

In this case, the Government argues that Brocklebank's testimony is evidence intrinsic to Count Six because it provides contextual information about how Francis was able to conceal his falsification of Arrington's tenancy, and, alternatively, that the evidence was admissible under Rule 404(b).

There is no inherent nexus between withholding tenants' payments and misappropriating Arrington's identity to create the false appearance of a lease for Apartment 711. The withheld payments were not discovered until September 2005, some 18 months after Cooper discovered there was no lease for Apartment 711. There is no evidence in the record that Francis withheld payments at the time he fabricated Arrington's lease or that he withheld payments throughout the 18-month period. There is no evidence that Francis converted or intended to convert the

_____

("[I]t is immaterial whether the instances are found occurring before or after the act charged.").

11

checks and money orders to his own use or that the withheld payments were for the apartments used as brothels. Thus, Brocklebank's testimony about the withholding of rent and utilities payments is not inextricably intertwined with the crime charged so as to be admissible under the intrinsic act doctrine.

Nevertheless, the district court did not abuse its discretion in admitting the testimony under Rule 404(b). Brocklebank testified that Francis recorded payments in the computer system but did not turn them over to be deposited in the Georgian Woods account. Such testimony is relevant to and probative of Francis' ability to create inaccuracies in the complex's business records consistent with creating false records of Arrington's tenancy. Brocklebank's testimony about the discrepancies is reliable both because he testified that he saw the inaccurate computer records himself, confronted Francis with them, and Francis then physically presented him with the withheld payments, and because Cooper corroborated his testimony. Nor did admitting the evidence offend Rule 403 because the testimony was unlikely to confuse the jury, and it was not so inflammatory as to subordinate reason to emotion. Accordingly, there is no reversible error in the admission of the testimony.

12

Francis argues that the ICE agent's testimony about the immigration status of the women riding in the van stopped on the New Jersey Turnpike was inadmissible hearsay, because the agent never spoke to the women and merely relied on reports of other law enforcement officials that were not introduced into evidence. In addition, the agent testified about information he found in databases, rather than producing the records themselves.

The Government asserts that Francis failed to object to the testimony at trial and that we should review this claim for plain error. We agree. The only objection made during the ICE agent's testimony came from Francis' co-defendant, who did not state a ground for the objection. Francis argues that his co-defendant's objection should be attributed to him even though he did not affirmatively join in it.

While some circuits permit an appellant to present an issue for review although the issue was preserved below only by the objection of a non-appellant co-defendant, e.g., United States v. Garcia, 291 F.3d 127, 140 (2d Cir. 2002) ("the objection of a co-defendant is an objection for all defendants, and it is sufficient to preserve the issue for appeal"), Francis cites no supporting authority for that position in this Circuit. It is unnecessary to address that issue, however, because the

objecting co-defendant in this case failed to state a ground for his objection. Therefore, he did not preserve a hearsay objection for <u>anyone</u>.[5] Consequently, we review this issue only for plain error.

> To prevail on plain error review, a defendant
>
> must demonstrate (1) that an error occurred, (2) that the error was plain, and (3) that it affected his substantial rights. If the defendant satisfies these threshold requirements, correction of the error is within our discretion, which is appropriately exercised only when failure to do so would result in a miscarriage of justice, such as when the defendant is actually innocent or the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

<u>United States v. Farrior</u>, 535 F.3d 210, 222 n.4 (4th Cir. 2008) (internal quotation marks omitted) (alteration in original). In this case, Francis has not met his burden to show prejudice because other evidence established that some of the prostitutes were illegal aliens transported across state lines. For example, one of the prostitutes, Flores Rangel, testified that she was an illegal alien from Mexico who traveled between New York and Maryland in one of Manuel Jandres' vans. Eliazor and Elsy both testified that many of their prostitutes were illegal

---

[5] The Federal Rules of Evidence require a party objecting to the admission of evidence to state the grounds for his objection. Fed. R. Evid. 103(a); <u>see also</u> <u>Chin</u>, 83 F.3d at 87 (4th Cir. 1996) (requiring objections to be made both timely and stating specific grounds).

aliens, and Eliazor and Manuel testified that the white vans shuttled prostitutes between New York, New Jersey, and Maryland. Accordingly, Francis does not prevail under plain error review.

## B.

We next turn to Francis' challenge to the sentence imposed by the district court. "We review a district court's sentence under an abuse of discretion standard for procedural reasonableness." United States v. Martinez-Varela, 531 F.3d 298, 299 (4th Cir. 2008). "[W]hen considering a sentence's reasonableness, we 'review the district court's legal conclusions de novo and its factual findings for clear error.'" United States v. Abu Ali, 528 F.3d 210, 261 (4th Cir. 2008) (quoting United States v. Hampton, 441 F.3d 284, 287 (4th Cir. 2006)). We "then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Gall, 128 S. Ct. at 597.

## 1.

Francis argues that his sentence is unreasonable because there was insufficient evidence to support the district court's application of a five-level enhancement under § 2G1.1 of the Sentencing Guidelines, which requires more than five victims. He contends the only evidence that there were more than five

15

victims on Count One is the ICE agent's testimony that the van stopped on the New Jersey Turnpike carried thirteen female passengers, and that testimony was inadmissible hearsay. This argument is without merit.

The formal rules of evidence do not apply to sentencing and reliable hearsay evidence may be considered. United States v. Jones, 31 F.3d 1304, 1316 (4th Cir. 1994) (citing Fed. R. Evid. 1101(d)(3) and U.S. Sentencing Guidelines Manual § 6A1.3). The reliability of the ICE agent's testimony is bolstered by Eliazor and Manuel's testimony that the prostitution ring operated two passenger vans to shuttle the prostitutes between New Jersey, New York, and Maryland. Thus, the district court did not commit clear error in finding the sentence enhancement applied.

2.

Francis next contends the district court erred in denying a minimal or minor role downward adjustment under § 3B1.2 of the Sentencing Guidelines, because he was unaware of the scope and structure of the Aparicio prostitution ring. We disagree.

Application Note 4 to § 3B1.2 states: "It is intended that the downward adjustment for a minimal participant will be used infrequently." Moreover,

> mitigating role adjustments apply only when there has been group conduct and a particular defendant is less culpable than other members of the group to such a

16

degree that a distinction should be made at sentencing between him and the other participants. However, whether a role in the offense adjustment is warranted is to be determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, but also by measuring each participant's individual acts and relative culpability against the elements of the offense of conviction.

United States v. Pratt, 239 F.3d 640, 646 (4th Cir. 2001) (internal citations and quotation marks omitted).

In this case, Francis entered the conspiracy at his own initiative when he approached Elsy and demanded continuing payments to conceal her Georgian Woods brothel. When Eliazor sought to expand the ring's operations at Georgian Woods, Francis demanded an upfront fee to obtain a new apartment and continuing payments to conceal its use. Francis also sought and received the services of the prostitutes for free. Thus, the district court found not only that Francis was "handsomely paid" for his role but that, without his participation, "the pervasiveness of this conspiracy would not have been as wide." (J.A. 417.) We agree. Because Francis initiated his role in the conspiracy and continued it for several months, and because that role was to conceal the existence of the conspiracy, we find no error in the district court's denial of a minimal or minor role downward adjustment.

17

Francis also claims the district court erred in denying a downward departure under § 5K2.0 of the Sentencing Guidelines, because as an alien subject to deportation he would be subject to harsher conditions of confinement and a period of administration detention upon release. We have previously held that 18 U.S.C. § 3742(a) does not permit a defendant to challenge the district court's denial of a downward departure unless the district court erroneously determined the defendant was not entitled to a downward departure as a matter of law. United States v. Bayerle, 898 F.2d 28, 30 (4th Cir. 1990).

There was no question in this case that the district court had authority to grant a downward departure, and the Government even conceded that point. Rather, the district court determined that Francis had not met his burden of proving that his immigration status would result in harsher conditions of confinement or administration detention upon release. "The court knew that it could depart. It refused because it concluded that the evidence did not justify departure." Bayerle, 898 F.2d at 31. Accordingly, Francis may not challenge the district court's refusal on appeal.

4.

Finally, Francis argues that the district court was too rigid in its calculation of his sentence: essentially, because he was sentenced before the decisions in Gall and Pauley, the district court was necessarily too reluctant to stray from the guidelines range and his sentence is therefore unreasonable. We disagree.

Verifying correct calculation of the sentencing guidelines range is the first step in determining whether a defendant's sentence is reasonable, Pauley, 511 F.3d at 473, but finding that the guidelines range was calculated correctly does not complete our review for reasonableness. We must also verify that the district court did not commit other procedural error, "such as . . . failing to consider the [18 U.S.C.] § 3553(a) factors . . . or failing to adequately explain the chosen sentence--including an explanation for any deviation from the Guidelines range." Gall, 128 S. Ct. at 597. Finally, after finding "the district court's sentencing decision is procedurally sound, [we] then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Id.; accord Pauley, 511 F.3d at 473. "In reviewing the substantive reasonableness of the sentence, we may consider 'the extent of the deviation,' but we 'must give due deference to the district court's decision that the § 3553(a)

19

factors, on a whole, justify the extent of the variance.'" Pauley, 511 F.3d at 473-74 (quoting Gall, 128 S. Ct. at 597).

That the district court sentenced Francis prior to the decisions in Gall and Pauley reflects merely the caprice of chronology rather than any defect in the sentence itself. To determine whether a sentence is reasonable, we examine how the district court arrived at it, not when it was imposed. We have already determined that the district court did not err in calculating the applicable sentencing guidelines range. After reviewing the record, we find the district court both properly considered the § 3553(a) sentencing factors and explained its decision to sentence Francis to 20 months' imprisonment on Count One and Count Two--ten months less than the applicable guidelines range.[6]

After calculating the guidelines range, the district court did not merely presume that the guidelines sentence was reasonable. Rather, it heard argument from each party, the testimony of four witnesses, and a statement from Francis himself during the sentencing hearing. The district court then explained that its sentencing analysis considered the nature of the offenses and their effect on society, Francis' own criminal

---

[6] The district court had no discretion with regard to the mandatory minimum, consecutive sentence on Count Six.

20

history, the effect of the sentence in protecting the public and deterring Francis from future criminal conduct, the disparity in Francis' sentence and the sentences of his co-conspirators, the effect of his incarceration on Francis' family, Francis' health, and the underlying public policy.

As a result of its careful consideration, the district court imposed a sentence one-third shorter than the low end of the applicable guidelines range. The sentence may not be one we would impose on Francis but, having found no procedural error in the district court's analysis and giving due deference to the district court that the § 3553(a) factors justify the variance, see Pauley 511 F.3d at 473-74, we hold that it is reasonable and based on the § 3553(a) factors. Accordingly, the district court did not abuse its discretion.

III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

21